THE HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR21-5336-RJB |
| Plaintiff, | |
| v. | DEFENSE SENTENCING MEMORANDUM |
| REYES DE LA CRUZ III, | |
| Defendant. | |

## I. INTRODUCTION

The Court will sentence Reyes De La Cruz, III on September 16, 2022. The defense respectfully recommends that the Court impose a total sentence of 30 months' custody followed by three years of supervised release. For Mr. De La Cruz – a man who has never before been to prison, has endured enormous trauma, suffers from post-traumatic stress disorder, has a long-standing substance use disorder, and who committed his offense while in the throes of his addiction – such a sentence is sufficient to achieve each of the goals of sentencing.

## II. BACKGROUND[1]

### A. Early Life

Reyes was born in Moses Lake, Washington in 1974 to Reyes Sr. and Debbie, when his parents were 22 and 18 years old respectively. They separated when Reyes

---

[1] Much of this background information was gathered by a social work student during their internship at our office. The included quotes are from Mr. Reyes's conversation with the intern.

DEFENSE SENTENCING MEMORANDUM
(*United States v. De La Cruz*, CR21-5336-RJB) - 1

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

was two years old and his father enlisted in the Army. Throughout the remainder of his childhood, Reyes was continuously uprooted, alternating between living with his mother and father.

At first, Reyes lived with his mother. He recalls that his father left the family "without anything." His mother and siblings did the best they could, but struggled. At times Reyes's mother shoplifted in order to feed her children.

Reyes then went to live with his father in California. He believes that his father sent for him so that he could claim Reyes as a hardship and leave the Army. After leaving the Army, his father turned to drug dealing to support himself. Reyes recalls him selling drugs throughout his childhood: "We were exposed to this lifestyle at a young age, but tried to look the other way." Reyes reports that his father beat him as far as back as he can remember and recounted that when he was two years old, his father slammed his head into the wall so hard that it left a dent. In addition to the beatings, his father was emotionally and psychologically abusive. Reyes recalls his dad was irritated frequently and would take those emotions out on him, telling Reyes that he was worthless and questioning his manliness.

Living with his mother and stepfather was no better. Reyes's mother and stepfather were both "alcoholics" and went to parties and bars all night, leaving the kids alone at the house. When they returned, they would "bring the bar back to the house." Reyes's stepfather physically abused both his mother and the kids. He would take off his belt and "start whacking" the kids and cursing when they returned home late or left a mess in their room. His stepfather was incarcerated when he inflicted serious injuries on Reyes's younger brother while he was in his crib. Despite the severity and persistence of this abuse, it was only after his mother learned that her husband had been sexually abusing Reyes's sister that she finally left her husband.

DEFENSE SENTENCING MEMORANDUM
(*United States v. De La Cruz*, CR21-5336-RJB) - 2

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

### B. School Years

In elementary school, Reyes says he fought with his peers often, particularly because his family did not have the financial means to purchase "in-style" clothing and other students teased him. Reyes says he had no school support at home and was an average student. Even without support at home, Reyes found personal motivation from his peers. He remembers thinking, "I want to be somebody," and recounts his role models were peers who had influential positions in school.

After many moves between his biological parents, Reyes eventually lived with his uncle, Renaldo. Renaldo was a uniquely positive influence in Reyes's life. His uncle taught him to carry himself in a motivated and disciplined manner. His uncle modeled the value of a sober life. And he encouraged Reyes to keep working hard. During this time Reyes became more involved in school and received the "Mr. Congeniality" school award.

The respite from abuse and exposure to drugs and alcohol was short-lived, but Reyes continued to heed his uncle's advice. In the middle of 10th grade, Reyes was uprooted to live again with his mother. He attended three different schools that year. Looking back, Reyes believes his mother was emotionally lost and moved the family around in response. Reyes's family ultimately relocated back to Yakima Valley where Reyes's brother Aaron became gang-involved and started selling drugs. He is currently in prison in Oregon.

In 11th grade, Reyes moved back to Moses Lake and began spending more time at a friend's house than his own. He joined the wrestling team, and he became increasingly career-oriented. He joined student government, became involved in theater, and generally found success. His mother explains, "he was a liked by everyone and he would help anyone." *See* Ex. 2 (support letters).

DEFENSE SENTENCING MEMORANDUM
(*United States v. De La Cruz*, CR21-5336-RJB) - 3

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

### C. Military Career and Transition to Adulthood

Mr. De La Cruz passed up a partial scholarship to college and instead joined the Marine Corps. In boot camp, Mr. De La Cruz graduated as the most "physically fit Marine." After boot camp, he completed infantry training and was selected for amphibious reconnaissance, where he underwent a grueling selection process. After successfully becoming a recon marine, Mr. De La Cruz deployed overseas. Mr. De La Cruz recalls his time in the Marine Corps as a "good experience," but mentions that he drank heavily with his Marine Corps peers.

During his time with the Marines, Mr. De La Cruz was the victim of Military Sexual Trauma and lost a Marine Corps peer unexpectedly during a night dive training exercise, both of which contributed to his PTSD diagnosis. The MST stems from a hazing incident. As Mr. De La Cruz was going through reconnaissance training, the recruits were blindfolded and forced to have sex with a person they believed to be a woman. It was later revealed to them that she was transgender. Reyes has involuntary and intrusive thoughts about both of these events. Additionally, he expresses feeling on "high alert" when he encounters someone who reminds him of his MST, and has had increased reactivity and a "fighting" instinct since these events. At times, he also has flashbacks to being in the Marines.

### D. Family and Career

Mr. De La Cruz attended Central Texas College and earned an associate's degree while in the military. When his girlfriend became pregnant with their daughter, he chose not to reenlist. Mr. De La Cruz moved back to Moses Lake and worked in construction for a year before starting a position with the State of Washington in about 1996. Over the next 7 years, Mr. De La Cruz worked for the state in various positions.

DEFENSE SENTENCING MEMORANDUM
(*United States v. De La Cruz*, CR21-5336-RJB) - 4

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

In Moses Lake, Mr. De La Cruz developed a relationship with Sonda and together they had a son. By all accounts and records, this relationship was profoundly unhealthy. Mr. De La Cruz drank heavily, in part because of a deep-seated unhappiness and untreated mental health issues. Sonda recalls Mr. De La Cruz had an "extreme" drinking and cocaine habit. Over time, their relationship worsened and the two separated. Although the relationship was tumultuous, Sonda says she thinks Mr. De La Cruz is a "good person on the inside" and they continue to be friends.

After Mr. De La Cruz and Sonda separated, he moved from Moses Lake to Spokane, where he reconnected with his father who had finished his prison sentence. Mr. De La Cruz's father became his "drinking buddy," and the two of them drank heavily together. He also had another child, a son who is high on the autism spectrum. Mr. De La Cruz has relationships with all of his children.

### E. Substance Use History

Mr. De La Cruz started drinking in the 6th grade, and had his first "buzz" in the 7th grade. He thought drinking was "fun," but his drinking tapered as he became more involved in sports and other hobbies. Eventually, though, alcohol and then other drugs became a part of Mr. De La Cruz's way of continuing on. As his mother explains, "Drugs became the answer to all of his tough life circumstances." Ex. 2. For a while, he saw himself as a "functional" addict, regularly drinking and using cocaine, but maintaining his job and relationships.

At various points, however, even he could not avoid how dysfunctional he had become. His substance use impacted his work, and he often called out or came to work late. He went to jail for driving under the influence. His family encouraged him to participate in treatment. Mr. De La Cruz has completed one 28-day inpatient program and several outpatient programs and has at times been able to maintain his sobriety.

DEFENSE SENTENCING MEMORANDUM
(*United States v. De La Cruz*, CR21-5336-RJB) - 5

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

By 2016, his drinking made keeping a job impossible. He also lost his housing. He stopped drinking only when he started using methamphetamine. In 2019 or 2020, he also started smoking heroin. During the first year of the COVID-19 pandemic and the time of his offenses, Mr. De La Cruz's methamphetamine and heroin use increased significantly. He worked from home and used heroin and methamphetamine, only sleeping three to four hours a day. Looking back, he is not sure how he survived this period of time, and credits his arrest with saving his life.

### F. Mental Health

In part because of the stigma surrounding mental illness, particularly in his community and in the military, Mr. De La Cruz has had only limited mental health therapy or counseling. Despite feelings of suicidality and prolonged periods of depression, he did what he had been taught – turned inwards and avoided discussing the pain of past events. He recognizes now that he does not have the tools on his own to address his PTSD and substance abuse disorder. He has read books while in custody regarding mental health, hoping to gain some tools, and is looking forward to the chance to engage in mental health treatment.

## III. SENTENCING GUIDELINES

The defense has no objection to Probation's advisory guideline calculation. As reflected in the sentencing recommendations before the Court, the guidelines grossly overestimate the appropriate punishment in this case.

In part the guidelines are a poor predictor because Mr. De La Cruz's criminal history category of VI overstates his criminal history. Mr. De La Cruz has six criminal history points attributable to driving offense. PSR ¶¶ 55-57. Moreover, while the names of some of his other offenses seem menacing, he has only one case that involves felony counts. PSR ¶ 58; compare PSR ¶¶53-54, 59. On none of these non-driving-related cases was Mr. De La Cruz sentenced to more than a couple of months of custody. He

DEFENSE SENTENCING MEMORANDUM
(*United States v. De La Cruz*, CR21-5336-RJB) - 6

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

has never been to prison. His history reflects his steady and increasing addiction to drugs, untreated PTSD, and related dysfunctional relationships.

Moreover, the guidelines are unable to account for Mr. De La Cruz's humanity, the incredible trauma he has endured, and his genuine remorse (*see* Exhibit) for his offense.

**IV.   SENTENCING RECOMMENDATION**

   **A.   Retribution**

Mr. De La Cruz is the first to acknowledge the seriousness of his offense and the way in which he betrayed his responsibilities to the state during a time of great need. Nonetheless, a sentence of 30 months' incarceration, three years of supervised release, and a financial obligation of $360,000 is sufficient to punish Mr. De La Cruz.

The defense agrees with the government regarding the unprecedented context of Mr. De La Cruz's offense, that there were "chaotic, desperate, and dire circumstances facing our nation." Dkt. 34 at 7. But while the nation reeled during the pandemic, so did Mr. De La Cruz. He was not immune from this unprecedented national crisis, but rather was particularly vulnerable to it. People like Mr. De La Cruz, people with substance use disorders and mental health challenges, suffered acutely during the pandemic. *See* Hayley Hudson, [COVID-19 Is Causing People To Relapse - Addiction Center](#) (April 30, 2020); [Macklemore Opens Up About 'Painful' COVID Relapse (people.com)](#) (last visited September 1, 2022). Working from home allowed Mr. De La Cruz to hide the severity of his substance use disorder. Co-workers and family members could not see how he was spiraling. Isolated and anxious, his mental health worsened, and he turned to his familiar crutch – drugs – to help him get through the day. As his addiction worsened, so did his judgment and need for money.

A 30-month sentence is significant punishment for Mr. De La Cruz. He has never before been to prison, and has never served a sentence longer than six months. A

DEFENSE SENTENCING MEMORANDUM
(*United States v. De La Cruz*, CR21-5336-RJB) - 7

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

sentence five times as long is sufficient to punish Mr. De La Cruz, particularly given the grim conditions in institutional settings during the ongoing pandemic.

### B. Deterrence and Incapacitation

The Court need not impose a longer sentence in order to convince Mr. De La Cruz of the wrongfulness of his actions or to protect the public from Mr. De La Cruz. Mr. De La Cruz has spent the last year thinking deeply about his decisions, how he ended up here, and what he can do to ensure that he never runs afoul of the law again. At first, plagued by guilt and faced with the consequences of his actions, Mr. De La Cruz thought his life was not one worth living. Over the last 12 months, he has come to recognize that his is a life worth living and that he need not be defined by his criminal conduct. He is determined to help others and is considering a career as a chemical dependency counselor. *See* Ex. 1. He is focused on addressing his mental health and substance use disorder, knowing that he cannot be of service to others, whether personally or professionally, until he himself is healthy and stable. Incarceration is unnecessary to the goals of deterrence and incapacitation.

Nor is a longer sentence necessary to achieve the goal of general deterrence. Research has refuted the notion of marginal general deterrence – that more severe sentences serve as a general deterrent to crime. As one criminologist concluded there is "no real evidence of a deterrent effect for severity." R. Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 817 (2010). "The fallacy that is marginal general deterrence is highlighted by the fact that nearly 90% of criminologists believe that it does not work, which is similar to the scientific consensus relating to the causes of global warming." Mirko Bagaric, Victoria Lambropolous, Lidia Xynas, *Excessive Criminal Punishment Amounts to Punishing the Innocent: An Argument for Taking the Parsimony Principle Seriously*, 57 S. TEX. L. REV. 1, 28 (2015). The literature on deterrence is clear that it is increased certainty of

DEFENSE SENTENCING MEMORANDUM
(*United States v. De La Cruz*, CR21-5336-RJB) - 8

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

being caught, not increased severity, that deters people from committing crimes. *See* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[E]vidence in support of the deterrent effect of various measures of the certainty of punishment is far more convincing and consistent than for the severity of punishment."); Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment* 4 (2010), available at https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf (last visited September 9, 2022) ("Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment.").

A federal felony conviction, incarceration for 30 months, supervised release for five years, and a $360,000 restitution order combine to provide severe enough punishment so as to deter others from believing crime pays.

### C. Rehabilitation

By all accounts, Mr. De La Cruz needs treatment, and that treatment is best provided in the community. While no substitute for community-based care, Mr. De La Cruz asks the Court to recommend his participation in the BOP's Residential Drug Abuse Program. He also asks that the Court recommend his placement at either Terminal Island or FCI Englewood, institutions with appropriate programming and training opportunities.

## V. CONCLUSION

Reyes De La Cruz has endured a lifetime of hardship and he is deeply remorseful for the hardship he has now caused others. He respectfully asks the Court to impose a sentence of 30 months' incarceration followed by five years of supervised release.

DEFENSE SENTENCING MEMORANDUM
(*United States v. De La Cruz*, CR21-5336-RJB) - 9

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

DATED this 9th day of September, 2022.

Respectfully submitted,

s/ *Corey Endo*
First Assistant Federal Defender
Attorney for Reyes De La Cruz III

DEFENSE SENTENCING MEMORANDUM
(*United States v. De La Cruz*, CR21-5336-RJB) - 10

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**